## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MIKE B. VIGIL,

       Plaintiff,

vs.                                                                 No. CIV 07-1159 JB/LCS

CITY OF ESPANOLA, JOSEPH MAESTAS,
MAYOR OF THE CITY OF ESPANOLA AND
INDIVIDUALLY, ALICE LUCERO, CITY
COUNCILOR AND IN HER INDIVIDUAL
CAPACITY, ALFRED HERRERA, CITY
COUNCILOR AND IN HIS INDIVIDUAL
CAPACITY, ROSARIO (CHAYO) GARCIA,
CITY COUNCILOR AND IN HER INDIVIDUAL
CAPACITY, DENNIS TIM SALAZAR, CITY
COUNCILOR AND IN HIS INDIVIDUAL
CAPACITY, CECILIA LUJAN, CITY
COUNCILOR AND IN HER INDIVIDUAL
CAPACITY, HELEN CAIN SALAZAR, CITY
COUNCILOR AND IN HER INDIVIDUAL
CAPACITY, EDDIE MAESTAS, CITY
COUNCILOR AND IN HIS INDIVIDUAL
CAPACITY, DANIELLE DURAN, CITY
COUNCILOR AND IN HER INDIVIDUAL
CAPACITY, JEFF CONDREY, CITY MANAGER
AND IN HIS INDIVIDUAL CAPACITY,
VERONICA MARTINEZ, CITY CLERK AND IN
HER INDIVIDUAL CAPACITY,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary

Judgment, filed August 21, 2008 (Doc. 24). The Court held a hearing on September 24, 2008. The

primary issue is whether Plaintiff Mike B. Vigil's heart condition was a disability under the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12201 to 12213. Because the Court

concludes that Vigil's medical condition was not a disability as the ADA defines the term, the Court will grant the motion in part. The Court declines to exercise supplemental jurisdiction over the remaining state claims in this case and will remand the remaining case to the First Judicial District Court.

**FACTUAL BACKGROUND**

The City of Espanola employed Vigil for many years. Vigil held several different positions, most recently as a groundskeeper in the Parks Department. He was a groundskeeper for a number of years when he suffered a heart attack. Despite his efforts, Vigil never returned to work and eventually retired. According to Vigil, the City discriminated against him on the basis of his heart condition. He contends that the City did not allow him to resume his old job, or offer him a new one, to force him to resign or retire. The Defendants' position is that they diligently sought to find a vacant position for him, but that he turned down the only one they located.

Many of the facts are undisputed. Vigil had a major heart attack on February 14, 2006. A co-worker drove him to Espanola Hospital, and once his condition stabilized, he was airlifted to the Albuquerque Heart Hospital. See Exhibit A to Defendants' Memorandum in Support of Motion for Summary Judgment, filed August 21, 2008 (Doc. 25)("Memo. in Support"), Affidavit of Gregory Lonewolf ¶¶ 4-5, at 2 (executed August 19, 2008)(Doc. 25-2)("Lonewolf Aff."). About a month after his heart attack, Vigil wanted to go back to work, but did not have the required medical releases. See id. ¶ 11, at 3-4.

According to the Defendants, Vigil showed up to begin working on March 20, 2006, without the releases, and the City gave him administrative leave so that he would not suffer any loss of pay while getting the releases. See id. ¶ 13, at 4. Vigil nevertheless contends that he lost work as a result of "the City's refusal to allow his return to work." Plaintiff's Memorandum in Support of

Answer in Opposition to Motion for Summary Judgment (Doc. No. 29), filed September 9, 2008 (Doc. 29)("Response")(parenthetical in original).

On March 9, 2006, Gregory Lonewolf, a City of Espanola Safety Officer, received a return-to-work form completed by Dr. Gregory Kunz, Vigil's cardiologist from the Albuquerque Heart Hospital.  See Lonewolf Aff. ¶ 16, at 5; Exhibit 1 to Memo. in Support, Return-to-Work (dated March 9, 2006)(Doc. 25-2)("March Form").  The form has a line that reads: "3. The employee is totally incapacitated at this time.  Employee will be re-evaluated on (date)," after which is hand-written "2/wks time."  The form also indicates, however, that Vigil could "restart back at work" on March 20, 2006.  Dr. Kunz, who signed the March Form, placed restrictions on Vigil's first two weeks back, checking a box for restricting work to four hours a day and writing after the line: "for 2 weeks ½ time."  Lonewolf interpreted Dr. Kunz' recommendations to require that any return to work in mid-March should be part-time, light-duty work, with constant observation by another person.  See id.  Lonewolf stated, however, that Dr. Kunz' form was "self-contradictory," and therefore he could not authorize Vigil to return to work.  Id.  Vigil maintains that he was able to work at the time, subject to certain limitations his physicians had set.  See Response at 3.

On April 18, 2006, Lonewolf received a new return-to-work form.  Dr. Kamel Abbouda, who was Vigil's treating physician at Los Alamos Medical Center's Espanola-based clinic, prepared this second form.  See Lonewolf Aff. ¶ 17, at 5; Exhibit 2 to Memo. in Support, Return-to-Work (dated April 18, 2006)(Doc. 25-2)("April Form").  The form states that Vigil was totally incapacitated as of April 18, 2006 and that he would be re-evaluated on June 15, 2006.  It concluded: "Patient cannot report to work until further notice."  Lonewolf believed that Dr. Abbouda's opinion was that Vigil could not return to work at all and did not give a time frame for when Vigil would be able to resume working.  See Lonewolf Aff. ¶ 17, at 5.  Lonewolf did not think he could authorize a return to work.

-3-

See id. ¶ 18, at 5.  Vigil states that, on April 10, 2006, he submitted a form authorizing him to work, with restrictions limiting him to moderate activity.  See Response at 3; Exhibit 2 to Response, Service Worker Form (dated April 10, 2006)(Doc. 29-3).

Lonewolf states that he tried to locate appropriate light-duty work for Vigil.  See Lonewolf Aff. ¶¶ 15, 26, at 4, 7.  He eventually identified positions at the Bond House Museum and at the Lucero Center.  See id. ¶ 26, at 7.  Lonewolf stated that Vigil, however, wanted to work only at his groundskeeper job.  See id. at 8.  Vigil contends that there were several other positions open that he could have filled.  See Response at 4.  Lonewolf states that he reviewed Vigil's deposition, in which Vigil names several jobs he believes he could have done.  Lonewolf states that these jobs, such as fire department dispatcher or greeter at the Convento -- a replica of a New Mexico monastery built in the city plaza -- were either not vacant, or were positions for which Vigil was not qualified or medically fit.  See Lonewolf Aff. ¶¶ 27-28, at 8.

Vigil retired and filed a claim with the New Mexico Department of Labor's Human Rights Division, asserting that the City discriminated against him on the basis of age and disability.  See Response at 2.  The Human Rights Division issued a probable-cause determination.  See Exhibit 1 to Response, Determination of Probable Cause (dated May 24, 2007)(Doc. 29-2).  Vigil then filed this lawsuit in the First Judicial District Court.  Vigil asserted a federal ADA claim, as well as state-law claims for tort and breach of contract, and discrimination under the New Mexico Human Rights Act ("NMHRA").

## PROCEDURAL BACKGROUND

The Defendants removed this case to federal court on the basis of federal-question jurisdiction.  See Notice of Removal ¶¶ 5-6, at 3-4, filed November 15, 2007 (Doc. 1).  On August 21, 2008, the Defendants filed their motion for summary judgment, as well as a supporting

memorandum.  Vigil filed an answer in opposition, see Plaintiffs Answer in Opposition to Motion for Summary Judgment (Doc. No. 28), filed September 9, 2008 (Doc. 28)(parenthetical in original), and filed a memorandum in support the same day, see Response.  The Defendants replied to Vigil's arguments later in September.  See Defendants' Reply in Support of their Motion for Summary Judgment, filed September 19, 2008 (Doc. 30)("Reply").

The Defendants argue that summary judgment should be entered in their favor primarily on the grounds that Vigil is not a "qualified individual with a disability" under the ADA.  While the Defendants acknowledge that a person may develop a physical impairment severe enough to be a disability as the result of a heart attack, they contend that Vigil has not met this standard.  See Memo. in Support at 7.  They argue that an impairment must be long-term, but that Vigil has said that his ailment was temporary.  See id. at 8.  They contend that Vigil must show more than an inability to perform the tasks associated with a particular job.  See id.  They maintain that Vigil has failed to demonstrate that his impairment has "significantly limited his ability to perform central manual life tasks like cooking, bathing, housekeeping, and laundry."  Id. at 9.  They also maintain that Vigil has not shown that he is "disabled from a class of jobs or a broad range of jobs in various classes as compared with an average person."  Id. at 10.

The Defendants also argue that Vigil has not met any alternative grounds for being classified as disabled under the ADA.  He does not, the Defendants assert, have a record of disability.  See id. at 11.  Nor, they maintain, has Vigil presented any evidence that the Defendants regarded him as disabled.  See id. at 12.  Additionally, the Defendants contend that, even though Vigil was not disabled, they undertook efforts to reasonably accommodate him.  They state that Lonewolf made repeated attempts to locate an acceptable position for him, but that Vigil rejected the job offered to him.  See id. at 14.

-5-

Vigil argues that Lonewolf's affidavit is not admissible because it involves testimony concerning Vigil's "medical condition and the proper interpretation of medical reports and records." Response at 4.  Although Vigil's argument is not completely clear, it appears that he is contending that Lonewolf is not competent to testify about Vigil's medical conditions.  Vigil contends that resolution whether he was disabled is inappropriate on summary judgment, especially because it would require the Court to determine Lonewolf's credibility.  See id. at 5.  Moreover, he asserts, ambiguities in the medical records would need to be resolved in his favor.  See id.  Vigil argues that he has made a prima-facie showing that "his cardiovascular impairment limits the major life activities of (1) physical exertion and . . . (2) 'working[.']"  Id. at 6.  Vigil further contends that the Defendants have "erred in asserting that [his] claims are limited only to federal claims," id. at 7, and requests that the Court either remand his state-law claims or exercise supplemental jurisdiction over them, but that summary judgment on them would be inappropriate as the claims were not included in the Defendants' motion, see id. at 7-8.

The Defendants counter that Vigil's ADA claim is analogous to his claim under the NMHRA.  See Reply at 2.  They also maintain that Vigil has offered no evidence of being disabled, and has not shown any causal connection between his alleged disability and an adverse employment action.  See id. at 3-4.  They argue that the Defendants never terminated Vigil's employment at all, much less because of his heart conditions, and thus have not breached any contract with Vigil or excluded him from employment with the City.  See id. at 6.

The Defendants further argue that Vigil's evidence is insufficient and that he has not presented an affidavit explaining why he cannot produce such evidence.  See id. at 7-8.  The Defendants contend that the three affidavits Vigil has submitted in opposition to the Defendants' motion are speculative and do not indicate they are based on personal knowledge.  See id. at 9.

Finally, the Defendants argue that the New Mexico Tort Claims Act grants immunity to the Defendants for any state cause of action, and that Vigil has not shown any exception to that immunity.  See id. at 11.  The Defendants maintain that it is appropriate for the Court to exercise jurisdiction over the state claims and dispose of them as part of the motion for summary judgment. See id. at 12.

At the hearing, the Defendants' counsel, Christopher Tebo, clarified that he believed that all Vigil's claims were dependent upon Vigil being disabled.  See Transcript of September 24, 2008 Hearing at 5:12-14 (Tebo)("Tr.").[1]  Mr. Tebo also stated that he believed there was nothing in the record suggesting that Vigil was fired, but rather had chosen to retire.  See id. at 9:4-9.  He argued that the Court should dismiss all of the claims in the case.  See id. at 12:21-22.

Vigil's attorney, Yvonne Quintana, admitted that Vigil's ADA claims was probably his weakest claim, and also stated that Vigil had retired, but that he was asserting constructive discharge based on being forced into retirement to maintain a steady flow of income.  See id. at 13:15-14:12 (Court, Quintana).  Ms. Quintana asserted that Vigil's position was that he was able to return to work after his heart attack, subject to certain limitations on his level of exertion.  See id. at 15:17-22 (Quintana).  "[H]e could do the work that he was doing before," Ms. Quintana said, id. at 16:7, but "Espanola sought to change the requirements of his job subsequent to his heart attack as a mechanism to exclude him," id. at 16:14-15.  Ms. Quintana stated that, if summary judgment were granted on Vigil's federal claim, Vigil would prefer the Court to remand his remaining state claims to state court.  See id. at 17:23-18:4.  Ms. Quintana also clarified that Vigil was not asserting any age-discrimination claims under federal law, but rather was appealing an administrative decision

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

about an age-discrimination claim under the NMHRA.  See id. at 20:10-22.

The Court questioned Mr. Tebo about the medical forms and why they did not create a genuine issue of material fact whether Vigil was disabled.  Mr. Tebo stated that the first medical form indicated that Vigil would be incapacitated for only two weeks, while the second was essentially done to facilitate Vigil receiving retirement benefits.  See id. at 30:19-31:16 (Court, Tebo).  The Court noted that it was inclined to remand the case if it found that Vigil was not disabled under the ADA because there were issues with the NMHRA that would be better handled in state court.  See id. at 37:23-38:1 (Court).

## STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the movant demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has "the 'initial burden to show that there is an absence of evidence to support the nonmoving party's case.'"  Mirzai v. State of N.M. Gen. Services. Dep't, 506 F.Supp.2d 767, 774 (D.N.M. 2007)(Browning, J.)(quoting Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)).  In addition to showing that there are no questions of material fact, the moving party must also show that it is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party meets that initial burden, the nonmoving party bears the burden of setting "forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(internal quotation marks omitted).

## LAW REGARDING MEDICAL CONDITIONS
## AS A DISABILITY UNDER THE ADA

To establish a prima-facie case of discrimination under the ADA, a plaintiff must show that: "(1) [he or] she is a disabled person as defined by the ADA; (2) [he or] she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) [he or] her employer discriminated against her because of her disability." MacKenzie v. City and County of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005). 42 U.S.C. § 12102 provides:

The term "disability" means, with respect to an individual –

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Merely having a medical condition does not make one disabled for purposes of the ADA. See Toyota Motor Mfg. Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002). "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires [those claiming the ADA's protection] . . . to offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." Id. at 198.

Determining whether someone is disabled within the meaning of the ADA because of a heart condition requires a three-step process: (i) whether the plaintiff's "heart condition is a physical impairment"; (ii) whether the any of the life activities the plaintiff identifies "constitutes a major life activity under the ADA"; and (iii) "whether the impairment substantially limited the major life activity." MacKenzie v. City and County of Denver, 414 F.3d at 1275. The first two issues are questions of law the court must resolve. See id.

-9-

A heart condition can be a physical impairment.  See id.  Major-life activities include such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working.  See Poindexter v. Atchison, Topeka and Santa Fe Ry. Co., 168 F.3d 1228, 1231 (10th Cir. 1999).  Physical exertion is not a major-life activity, but "working" has been recognized as a major-life activity.  MacKenzie v. City and County of Denver, 414 F.3d at 1275.  If the plaintiff's disability relates to the major-life activity of work, the plaintiff must demonstrate that he or she is

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).

The appropriate inquiry is whether the plaintiff could not perform tasks central to most people's daily lives, not whether she could perform the tasks associated with a specific job.  See Toyota Motor Mfg. Ky., Inc. v. Williams, 534 U.S. at 200.  "If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs."  Corley v. Dep't of Veterans Affairs ex rel. Principi, 218 Fed.Appx. 727, 738 (10th Cir. 2007).   A claimant is not required to

> present evidence of a precise number of jobs from which he was disqualified because of his impairment. But in his circumstances he did need to present evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g., few, many, most) from which [he] would be excluded.

Id.  at 739 (internal quotation marks and citations omitted).

For an impairment to qualify for purposes of the ADA, "[t]he impairment's impact must .

-10-

. . be permanent or long term." Toyota Motor Mfg. Ky., Inc. v. Williams, 534 U.S. at 198.  See

Velarde v. Associated Reg'l and Univ. Pathologists, 61 Fed.Appx. 627, 631 & n.3 (10th Cir.

2003)(holding that impairments lasting less than two months did not substantially limit the

claimant's overall functioning); McKenzie v. Dovala, 242 F.3d 967, 973 (10th Cir. 2001)(stating

that approximately four months of missed work would not "tend to support a finding of disability,

inasmuch as [the plaintiff] has been released to return to work, [but] the evidence as a whole could

lead a reasonable jury to conclude that she had a record of a disability for purposes of the ADA.").

The Tenth Circuit noted in Aldrich v. Boeing Co., 146 F.3d 1265 (10th Cir. 1998), that:

> Although temporary, non-chronic impairments of short duration, with little or no
> long term or permanent impact, are usually not disabilities . . . . an impairment does
> not necessarily have to be permanent to rise to the level of a disability. Some
> conditions may be long-term, or potentially long-term, in that their duration is
> indefinite and unknowable or is expected to be at least several months. Such
> conditions, if severe, may constitute disabilities.

146 F.3d at 1270 (internal quotation marks and citations omitted).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

Federal courts are courts of limited jurisdiction.  While there is no question that a statutory

basis exists for the Court to exercise jurisdiction over the controversy, the issue is whether the Court

should exercise its limited discretion to decide the state claims if it dismisses the federal claim.  The

courts and Congress have indicated when a district court may exercise its discretion to remand state

claims and what factors it may consider.

**1.      Supplemental Jurisdiction.**

It is a fundamental precept of American law that the federal courts are "courts of limited

jurisdiction."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal

courts "possess only that power authorized by [the] Constitution and statute."  Kokkonen v.

-11-

Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331, 1332.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.  Federal courts may exercise pendent jurisdiction over state-law claims when "state and federal claims . . . derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Ancillary jurisdiction gives federal courts the flexibility to hear a cause of action even after the introduction of third parties whose insertion into the litigation is not supported by any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it.  See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n.18 (1978).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See 16 Moore's Federal Practice, § 106.04[5] (Matthew Bender 3d ed.).  In response to the Committee's findings regarding "pendent" and "ancillary" jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

[I]n any civil action of which the district courts have original jurisdiction, the district

-12-

> courts shall have supplemental jurisdiction over all other claims that are so related
> to claims in the action within such original jurisdiction that they form part of the
> same case or controversy under Article III of the United States Constitution. Such
> supplemental jurisdiction shall include claims that involve the joinder or intervention
> of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts

"supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on

claim and party joinder to deal economically -- in single rather than multiple litigation -- with

matters arising from the same transaction or occurrence."  Report of the Federal Courts Study

Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

### 2. **District Court Discretion.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental

jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman

v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi.

v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental

jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to

decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion

in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and

fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.

Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should

consider:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the
> district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction,
> or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis, and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("Section 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Executive Software N. Am., Inc. v. U.S. Dist. Court, 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c).").  At least one other district court in the Tenth Circuit has reached the same conclusion.  See Gudenkauf v. Stauffer Comm'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

Once the statutory conditions are met, however, district courts retain discretion to decline to exercise supplemental jurisdiction. See Dahn v. United States, 127 F.3d 1249, 1255 (10th Cir.

-14-

1997).  "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."  <u>Smith v. City of Enid By and Through Enid City Comm'n</u>, 149 F.3d 1151, 1156 (10th Cir. 1998).

<u>ANALYSIS</u>

Vigil's federal ADA claim is that the City of Espanola discriminated against him because of his heart problems.  Vigil's federal case depends upon him being disabled within the meaning of the ADA.  Vigil's heart condition, however, was not long-term enough to be considered a disability.  Because Vigil's heart condition was not long term, he has no cause of action for discrimination under the ADA.  While his ADA claim is his only federal claim, Vigil also has several state-law causes of action.  Although the Defendants urge the Court to exercise supplemental jurisdiction over these state claims and decide them, the Court will decline to do so.  In these circumstances, the Court believes that it is better to allow the state courts to resolve state issues.  There being no federal issues left, the Court will remand the case.

## I.  VIGIL HAS FAILED TO ESTABLISH THAT HE WAS DISABLED WITHIN THE MEANING OF THE ADA.

To establish a prima-facie case of discrimination under the ADA, Vigil must show that: (i) he was disabled within the meaning of the ADA; (ii) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job as groundskeeper or another job he desired; and (iii) that the Defendants discriminated against him because of his disability.  <u>See MacKenzie v. City and County of Denver</u>, 414 F.3d at 1274.  If Vigil cannot meet the first prong of this test – that he was disabled under the ADA – he cannot sustain a claim of disability discrimination under federal law.

As relevant here, a disability is defined as "a physical or mental impairment that substantially

-15-

limits one or more of the major life activities of" an individual.  42 U.S.C. § 12102(2)(A).

Determining whether Vigil is disabled requires a three-part analysis: (i) whether his "heart condition

is a physical impairment"; (ii) whether the any of the life activities he identifies "constitutes a major

life activity under the ADA"; and (iii) whether his "impairment substantially limited the major life

activity."  MacKenzie v. City and County of Denver, 414 F.3d at 1275.  The first two issues are

questions of law for the Court to decide.  See id.

Physical impairment resulting from a heart attack can be a disability under the ADA.  See

Clayton v. Pioneer Bank, No. CV 07-0680 JB, Memorandum Opinion and Order at 33-36, filed

August 12, 2008 (Doc. 46)(D.N.M.)(Browning, J.)("Clayton v. Pioneer Bank, Memorandum

Opinion and Order").  The impairment, however, must "be permanent or long term."  Toyota Motor

Mfg. Ky., Inc. v. Williams, 534 U.S. at 198.  The impairment must also substantially limit the

person's ability to perform one or more major-life activities.  See id.  Complete incapacitation from

the impairment is sufficiently severe to meet this standard.  See Clayton v. Pioneer Bank,

Memorandum Opinion and Order at 33.

Vigil identifies two major-life activities that his heart condition has limited: (i) physical

exertion; and (ii) working.  See Response at 6.  While physical exertion is not a major-life activity,

"working" is.  MacKenzie v. City and County of Denver, 414 F.3d at 1275.  Vigil's briefing on this

issue was not extensive, but at the hearing, he indicated that he was primarily relying on his doctors'

determinations that he was incapacitated and unable to work without accommodation.  See Tr. at

22:2-6 (Quintana).  These determinations are contained in the two return-to-work forms his doctors

completed.  See March Form; April Form.

Contrary to Lonewolf's interpretation, the Court does not find the March Form internally

inconsistent.  The form has a line that reads: "3. The employee is totally incapacitated at this time.

Employee will be re-evaluated on (date)," after which is hand-written "2/wks time." The form also indicates, however, that Vigil could "restart back at work" on March 20, 2006, and was signed on March 9, 2006. March 20, 2006, while not precisely two weeks from March 9, 2006, was the second Monday after the day the form was signed. Dr. Kunz, who signed the March Form, placed restrictions on Vigil's first two weeks back, checking a box for restricting work to four hours a day and writing after the line: "for 2 weeks ½ time." Dr. Kunz restricted Vigil to working five days a week, limited his lifting to twenty pounds, and placed no restrictions on his movement.

The March Form does not demonstrate that Vigil was totally incapacitated as of March 20, 2006. The details of the form strongly indicate that Vigil could resume working as of March 20, 2006, so long as he observed certain restrictions. Lonewolf may have felt that he could not authorize a return to work under the City's safety policy in these circumstances, but that is a separate question from whether the form demonstrates Vigil was totally incapacitated. Read as a whole, the March Form states that, as of March 9, 2006, Vigil was incapacitated, but that by March 20, 2006, he would be able to return to work, subject to some restrictions. It does not demonstrate that he was completely incapacitated; especially considering that he showed up for work on March 20, 2006, only to be turned away because the City did not feel the March Form complied with its policies. See Lonewolf Aff. ¶¶ 13, 16, at 4, 5. Vigil also presented the City with another form on April 10, 2006, stating that he could work and could undertake moderate exertion activities. See Service Worker Form at 2.

The April Form apparently prepared by Dr. Abbouda contains a different assessment than the March Form does.[2] It states that Vigil was totally incapacitated as of April 18, 2006 and that he

---

[2] The April Form is signed with a textbook example of a doctor's signature, so the Court must rely on the Defendants' representation that this form was prepared by Dr. Abbouda.

would be re-evaluated on June 15, 2006.  It concluded: "Patient cannot report to work until further notice."  While the form is internally consistent, a few days later, on April 26, 2008, Vigil entered Lonewolf's office and was angry because he believed he was fully capable of performing his groundskeeper duties.  See Lonewolf Aff. ¶ 25, at 7-8; Memo. in Support ¶ 11, at 5 (undisputed material fact).  Vigil does not dispute this incident occurred.  The incident suggests that he was not "totally incapacitated" at the time.  Although the Defendants' counsel suggested at the hearing that Vigil may have arranged the "total incapacity" finding as part of acquiring retirement benefits, the Court does not believe that can properly be considered as part of the context of the April Form.  Still, Vigil's activities at this time raise doubts.  Ultimately, however, these doubts must be resolved in his favor during summary judgment.

Nonetheless, the April Form indicates total incapacitation only until June 15, 2006.  Vigil has offered no evidence that he was re-evaluated or that he remained incapacitated after that date.  Even construing all the evidence liberally in his favor, the evidence demonstrates at best that he was totally incapacitated for a period of about three months, from his heart attack on February 14, 2006, until March 20, 2006, and again from April 18, 2006 to June 15, 2006.

Three months is a significantly shorter period of time than the nine months in Clayton v. Pioneer Bank.  See Clayton v. Pioneer Bank, Memorandum Opinion and Order at 35.  While somewhat longer than the two months in Velarde v. Associated Reg'l and Univ. Pathologists, see 61 Fed.Appx. at 631 & n.3, it is less than the four months in McKenzie v. Dovala, which was found to be a period that would tend to not demonstrate disability, see 242 F.3d at 973.  Three months would thus not be sufficient to show that Vigil's impairment was "permanent or long term."  Toyota Motor Mfg. Ky., Inc. v. Williams, 534 U.S. at 198.

A three-month period of incapacitation is insufficient to create a genuine material fact

-18-

whether his "impairment substantially limited the major life activity" of working.  <u>MacKenzie v.</u> <u>City and County of Denver</u>, 414 F.3d at 1275.  Moreover, whatever support this amount of time provides for Vigil's claim is undercut by Vigil's actions during that period and Vigil's assertions in this case.  A week after submitting the April Form, Vigil came into Lonewolf's office, arguing that he was able to work.  <u>See</u> Lonewolf Aff. ¶ 25, at 7-8.  Additionally, in a letter to the New Mexico Human Rights Division, Ms. Quintana asserts that Vigil's work restrictions did "not constitute a permanent requirement."  Exhibit 3 to Response, Letter from Yvonne K. Quintana to Lillian Weinreb at 2 (dated March 6, 2007)(Doc. 29-4).  At the hearing, Ms. Quintana stated that Vigil "could do the work that he was doing before."  Tr. at 16:7 (Quintana).  Based on the evidence provided, there is no genuine issue of material fact whether Vigil was disabled within the meaning of the ADA.  The evidence, construed in his favor, is insufficient to show impairment for a long enough term to qualify as a disability.

Vigil has not argued that he was disabled within the other two possible definitions under the ADA: (i) a record of disability; or (ii) the Defendants' regarding him as disabled.  Accordingly, because his heart condition did not limit any major-life activities of Vigil's over a long-term period of time, he has failed to carry his burden under the first prong of the test for disability discrimination.

## II.     <u>THE COURT WILL REMAND THE REMAINING CASE.</u>

As the Court indicated at the hearing, there are some potentially complex or novel issues regarding Vigil's discrimination case under the NMHRA.  The NMHRA prohibits covered employers from taking certain discriminatory actions against an employee on the basis of an employee's "serious medical condition."  N.M.S.A. 1978, § 28-1-7. "Serious medical condition" may be broader in scope than the term "disability" under the ADA.  <u>See</u> <u>Clayton v. Pioneer Bank</u>,

-19-

Memorandum Opinion and Order at 52.  While the two terms overlap, serious medical condition might encompass Vigil's condition even though the ADA's definition of disability does not.

Because there are no federal claims other than the ADA claim, the Court may decline supplemental jurisdiction over the state claims.  <u>See</u> 28 U.S.C. § 1367(c)(3).  The Court believes that the best course of action would be to not exercise supplemental jurisdiction and allow the New Mexico state courts to decide the issues of state law that remain.  <u>See</u> <u>Smith v. City of Enid By and Through Enid City Comm'n</u>, 149 F.3d at 1156 ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is granted in part.  The Court will enter judgment in favor of the Defendants on Plaintiff Mike B. Vigil's claim under the Americans with Disabilities Act, but will not rule on the state law causes of action.  The Court will remand the remaining case to the First Judicial District Court, County of Rio Arriba, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Yvonne K. Quintana
Espanola, New Mexico

    *Attorney for the Plaintiff*

Paula Grace Maynes
Christopher J. Tebo
Miller Stratvert, P.A.
Santa Fe, New Mexico

    *Attorneys for the Defendants*